IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

BILLY D. SMITH                                                                                          PLAINTIFF

v.                                              No. 3:09CV00027 JLH

MARINE TERMINALS OF ARKANSAS, INC.                                              DEFENDANT

**OPINION AND ORDER**

Billy D. Smith has sued Marine Terminals of Arkansas, Inc., for damages under section 33 of the Merchant Marine Act, 46 U.S.C. § 30104 ("the Jones Act"); for unseaworthiness and maintenance and cure under general maritime law; and for damages under the Longshoremen's and Harbor Workers' Compensation Act ("the LHWCA"), 33 U.S.C. § 905(b). Marine Terminals has moved for summary judgment. The first issue is whether Smith was a seaman or a longshoreman. For reasons that will be explained, he was a longshoreman, not a seaman, so summary judgment will be entered on the Jones Act claim and general maritime law claims. Because Smith was a longshoreman, it is necessary to decide Smith's section 905(b) claim. On that claim the issue is whether the negligence that caused Smith's injury is attributed to Marine Terminals in its capacity as a vessel owner or in its capacity as employer engaged in stevedore operations. Smith was injured while working on a vessel the sole purpose of which was to engage in stevedore operations. The Court cannot say as a matter of law that Smith was not engaged in vessel operations because in this instance vessel operations and stevedore operations were one and the same, so summary judgment will be denied on Smith's section 905(b) claim.

I.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party carries its burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552.

**II.**

Smith worked for Marine Terminals driving 50-90 ton trucks, hauling various types of loose iron or steel from a dock barge owned by Marine Terminals to a scrap yard owned by an entity identified in the record only as Nucor.[1] Occasionally, Smith would walk along the roadway between the dock barge and the scrap yard to retrieve scrap steel that fell off the trucks. The dock barge was a floating dock near the riverbank tied to the shore by suspension cables and connected to land by a ramp. Smith would back the truck down the ramp onto the dock barge where a crane operator

---

[1] Presumably, the reference is to Nucor Corporation, a publicly traded company that produces steel.

would transfer iron or steel from river barges to the truck using a hydraulic crane fitted with a clamshell bucket. Before a river barge could be unloaded, it had to be secured to the dock barge by suspension cables connected to a winch system located on the dock barge. As the crane emptied a portion of the river barge, the river barge would be moved along the side of the dock barge so that the crane could reach more iron or steel. This process created "slack" in the cable that had to be taken up before the next river barge could dock and be unloaded. To draw the slack from the cable, a Marine Terminals employee would throw a rope into the clamshell bucket of the crane, and the crane operator would close the bucket on the rope and pull on it. This procedure was described by Rickie Ellis, a member of Marine Terminals' management personnel, as "damned dangerous." On the date of his injury, Smith was asked to participate in this procedure, which he had never done before. Instead of throwing the rope in the clamshell bucket, he placed his hand with the rope in the bucket evidently in an attempt to hook the rope in the bucket. Not realizing that Smith's hand was in the bucket, the crane operator closed the bucket, seriously injuring Smith.

### III.

Marine Terminals moves for summary judgment on Smith's claims under the Jones Act, for unseaworthiness, and for maintenance and cure, arguing that, as a matter of law, Smith is not a seaman. As to Smith's claim under section 905(b), Marine Terminals argues that, as a matter of law, no negligence can be attributed to it in its capacity as a vessel owner—a *sine qua non* for section 905(b) liability. These arguments are considered below.

**A.     THE JONES ACT**

Although the Jones Act uses the term "seaman," it does not define this term. In *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368, 115 S. Ct. 2172, 2190, 132 L. Ed. 2d 314 (1995), the Supreme Court stated, "we think that the essential requirements for seamen status are twofold."

> First, as we emphasized in *Wilander*, an employee's duties must contribute to the function of the vessel or the accomplishment of its mission. . . . Second, and most important for our purposes, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature. The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

*Id.* (internal citations and quotation marks omitted). The first requirement is a "threshold requirement" that is very broad and generally easily satisfied. *Id.*; *Becker v. Tidewater, Inc.*, 335 F.3d 376, 387-88 (5th Cir. 2003). The second requirement is composed of two components: the employment must be substantially connected to the vessel in navigation both in duration and in nature. *See Chandris*, 515 U.S. at 370-71, 115 S. Ct. at 2191. "[I]t is important that a seaman's connection to a vessel in fact be substantial in both respects." *Id.*

With respect to the durational component, the Supreme Court has adopted the Fifth Circuit's rule of thumb that, ordinarily, a "worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.* Conversely, if the worker spends at least 30 percent of his or her time in the service of a vessel, then whether the durational component of the second *Chandris* requirement is satisfied becomes a fact question for a jury to resolve. "Seaman status is usually a fact-intensive inquiry properly left to the

jury to resolve." *Johnson v. Cont'l Grain Co.*, 58 F.3d 1232, 1235 (8th Cir. 1995) (citing *Roth v. U.S.S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir. 1994)).

Marine Terminals does not contend that Smith's duties failed to contribute to the function of the vessel or the accomplishment of its mission, nor that Smith spent too little time on the dock barge to satisfy the durational component. Marine Terminals argues that Smith's duties were not of a seagoing nature but rather land based and, therefore, Smith's employment duties were not substantially connected to the dock barge in nature. It is undisputed that the dock barge's only function was to serve as a dock on which the crane would unload steel and iron from river barges and place the steel and iron in trucks.

Several cases support Marine Terminals' argument that a worker's duties must be of a seagoing nature or expose him to the perils of the sea. *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 555, 117 S. Ct. 1535, 1540, 137 L. Ed. 2d 800 (1997) ("For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea. This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful in distinguishing land-based from sea-based employees."); *Denson v. Ingram Barge Co.*, No. 5:07-cv-00084-R, 2009 WL 1033817, *3 (W.D. Ky. April 16, 2009) ("The Court finds that [plaintiff] was not a seaman because his duties did not expose him to the perils of the sea."); *Roberts v. Ingram Barge Co.*, No. 5:07-cv-00210-R, 2009 WL 1034111, *3 (W.D. Ky. April 16, 2009) (same); *Schultz v. Louisiana Dock Co.*, 94 F. Supp. 2d 746, 750 (E.D. La. 2000); *Frazier v. Core Industries, Inc.*, 39 So. 3d 140, 156-57 (Ala. Sup. Ct. 2009); *Richard v. Mike Hooks, Inc.*, 799 So. 2d 462, 466-67 (La. Sup. Ct. 2001). These cases comport with the Court's statement in *Chandris*

that the purpose of the substantial connection requirement is to separate maritime employees from land-based workers "whose employment does not regularly expose them to the perils of the sea." *Chandris*, 515 U.S. at 368, 115 S. Ct. at 2190.

On the other hand, Smith points to *Lara v. Harvey's Iowa Mgmt. Co., Inc.*, 109 F. Supp. 2d 1031, 1037 (S.D. Iowa 2000), where the district court held that since the plaintiff "routinely worked on Defendant's fully operational ship [but which never moved while Lara was on it] located on the Missouri River, a reasonable jury could conclude she was a sea-based, Jones Act employee." The court in *Lara* noted that the plaintiff "spent most of her working hours on board the Kanesville Queen located on the Missouri River doing that ship's work-serving drinks, clearing tables, and otherwise attending to the ship's customers." *Id.* Marine Terminals attempts to distinguish *Lara* based on the fact that the district court in that case found that the defendant had treated the plaintiff as a seaman, but the court stated that "[e]ven absent this affirmative conduct by the [defendant], there is a sufficient record for a jury to conclude [plaintiff] was a Jones Act "seaman" as required by the two-part test in *Chandris*. *Lara*, 109 F. Supp 2d at 1036, 1038.

Neither party noted the two other post-*Chandris* cases from Southern Iowa that have decided whether employees of the Kanesville Queen were seamen. In *Valcan v. Harvey's Casino*, No. 98CV80067, 2000 WL 33673727, *1 (S.D. Iowa June 15, 2000), the district court held that an injured cocktail waitress employed on the Kanesville Queen failed "both the test of a temporal connection to a vehicle in navigation and the test that she regularly be exposed to the perils of the sea." That case involved "an injured cocktail waitress employed on a river boat casino" sued under the Jones Act and general maritime law. *Id.* Later, in *Frederick v. Harvey's Iowa Mgmt. Co., Inc.*,

6

177 F. Supp. 2d 933, 937-38 (S.D. Iowa 2001), the district court rejected the reasoning in *Valcan* and adopted that from *Lara*, holding that a casino dealer working on the Kanesville Queen was a seaman.

The Fifth Circuit, in *In re Endeavor Marine Inc.*, 234 F.3d 287, 291 (5th Cir. 2000), has explained that *Papai's* " 'going to sea' passage . . . is a shorthand way of saying that the employee's connection to the vessel regularly exposes him 'to the perils of the sea.' " Further, the court found that the Supreme Court did not intend

> to articulate a new and specific test for seaman status . . . [but] merely restated the point it had made in *Chandris*, when it explained that [we] eschew the temptation to create detailed tests to effectuate the congressional purpose, tests that tend to become ends in and of themselves. The principal formulations employed by the Courts of Appeals—more or less permanent assignment or connection to a vessel that is substantial in terms of its duration and nature—are simply different ways of getting at the same basic point: The Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to the special hazards and disadvantages to which they who go down to sea in ships are subjected.

*Id.* at 291-92 (internal citations and quotations omitted). That explanation by the Fifth Circuit refers to the following passage in *Chandris*: "In defining the prerequisites for Jones Act coverage, we think it preferable to focus upon the essence of what it means to be a seaman and to eschew the temptation to create detailed tests to effectuate the congressional purpose, tests that tend to become ends in and of themselves." *Chandris*, 515 U.S. at 369, 115 S. Ct. at 2190.

Focusing on "the essence of what it means to be a seaman" and "the congressional purpose" in enacting the Jones Act, Smith was not a seaman. Apart from "tests that tend to become ends in and of themselves," no reasonable person would classify Smith's job as that of a seaman. Smith was a land-based worker whose duties included assisting in unloading barges from a floating dock a few feet from the riverbank. His primary job was driving a truck. As noted, he also assisted to some extent in unloading cargo from barges into the truck that he drove. He was therefore a truck driver

7

and a longshoreman.[2] He faced the perils of a truck driver and a dock worker, not those of a seaman. Stretching the judicially created tests to classify Smith's job as that of a seaman would not, by any reasonable argument, effectuate congressional intent in enacting the Jones Act.

Based on the undisputed facts, the nature of Smith's job was that of a longshoreman, not that of a seaman. Marine Terminals' motion for summary judgment on Smith's claims under the Jones Act is therefore granted.

**B.     UNSEAWORTHINESS**

Marine Terminals argues that Smith is not a seaman but rather a longshoreman protected under the LHWCA and, therefore, that Smith is barred from recovering for unseaworthiness under maritime law. "[S]eaman status for purposes of the warranty of seaworthiness is accorded to that class of persons who may claim the protection of the Jones Act and the doctrine of maintenance and cure." Schoenbaum, *supra*, at § 4-27. For the reasons stated, Smith was not a "seaman." He was a "longshoreman." Therefore, Marine Terminals' motion for summary judgment on Smith's unseaworthiness claim is granted.

**C.     MAINTENANCE AND CURE**

For the same reasons, Marine Terminals argues that Smith is barred from recovering for maintenance and cure maritime law. Again, "[t]he standard for determining seaman status for purposes of maintenance and cure is the same as that established for determining status under the Jones Act." *Hall v. Diamond M Co.*, 732 F.2d 1246, 1248 (5th Cir. 1984). Thus, for the same

---

[2] "The job of longshoremen is to load and unload vessels." Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-10 (4th ed. 2004).

reasons, Marine Terminals' motion for summary judgment on Smith's maintenance and cure claim is granted.

**D.     SECTION 905(b) OF THE LHWCA**

Unlike the Jones Act, which provides seamen with a tort-based recovery for injuries, the LHWCA mandates a workers' compensation approach. *See* Schoenbaum, *supra*, at § 4-9. While some may believe this disparate treatment to be unfair, it is the system selected by Congress. *Id.* at §§ 4-9, 5-10.

While the LHWCA bars a longshoreman from suing his employer for damages in tort for injuries suffered at work, it permits such suits against third parties. In section 905(b), Congress specifically created a cause of action for negligence against vessel third parties.

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.

33 U.S.C. § 905(b).

When the employer of the longshoreman is also the owner of the vessel—a so called "dual capacity employer"—a conceptual conflict arises between the LHWCA's bar on suits in tort against the employer on the one hand and section 905(b)'s express authorization of negligence suits against vessels on the other. In *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 530-32, 103 S. Ct. 2541, 2547-48, 76 L. Ed. 2d 768 (1983), the Supreme Court held that a section 905(b) cause of action may lie against a dual capacity employer. However, the Court noted that the section "does make it clear that a vessel owner acting as its own stevedore is liable only for negligence in its

'owner' capacity, not for negligence in its 'stevedore' capacity." *Id.* at 531, n.6, 103 S. Ct. at 2547 n.6; *see also Castorina v. Lykes Bros. S.S. Co., Inc.*, 758 F.2d 1025, 1033 (5th Cir. 1985) (holding that the section 905(b) duties are "neither heightened nor diminished when the longshoreman is employed directly by the vessel.").

Resolving the conceptual conflict between defendant as employer and defendant as vessel owner requires a court "to analyze the allegedly negligent conduct to determine whether that conduct was performed in the course of the operation of the owner's vessel as a vessel or whether the conduct was performed in furtherance of the employer's [stevedoring] operations." *Grennan v. Crowley Marine Services, Inc.*, No. C05-1504-JCC, 2006 WL 623847, *4 (W.D. Wash. Mar. 10, 2006) (citing *Gravatt v. City of New York*, 226 F.3d 108, 125 (2nd Cir. 2000) and *Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 613 (1st Cir. 1996)) (internal quotations omitted). In answering this threshold question, if the court determines that the conduct was performed in furtherance of the employer's stevedoring operations, then the negligence suit is barred. *Jones*, 462 U.S. at 531 n.6, 103 S. Ct. at 2547 n.6. Alternatively, if the conduct was performed in the course of vessel operations, then the tort action is not barred. *Id.* at 532, 103 S. Ct. at 2548. The difficulty here is that the operations of the vessel, *i.e.*, the dock barge,[3] were exclusively stevedoring operations. The parties have cited no cases, and the Court has found none, in which the vessel was a dock barge used exclusively for stevedoring operations.

In order to recover under section 905(b), a plaintiff must establish, *inter alia*, that the vessel owner owed a duty to the plaintiff to protect against the hazard that caused the injury. "It is now well

---

[3] The parties stipulated that the dock barge is a vessel, presumably because it is capable of being used as a means of transportation on water. *See* 1 U.S.C. § 3.

accepted that shipowners owe three narrow duties to longshoremen: (1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and (3) a duty to intervene." *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 391 (5th Cir. 2008) (citing *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98, 114 S. Ct. 2057, 2063, 129 L. Ed. 2d 78 (1994) and *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981)). According to the Supreme Court, the turnover duty requires the vessel owner to " 'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.' " *Howlett*, 512 U.S. at 98, 114 S. Ct. at 2063 (citing *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 n.18, 89 S. Ct. 1144, 1151 n.18, 22 L. Ed. 2d 371 (1969)). A vessel owner breaches the active control duty "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167, 101 S. Ct. at 1622.

Smith argues that Marine Terminals as vessel owner violated its turnover duty by using a dock barge that did not have equipment for safely withdrawing the slack from the suspension cables to enable a river barge to dock with the dock barge. Marine Terminals argues that it did not breach the turnover duty "for the simple reason that the dock barge played no role in the Plaintiff s injury, other than the coincidence that the injury happened to occur on the dock barge." This argument fails. A jury could find that the dock barge did play a direct role in Smith's injury on the ground that

Marine Terminals as vessel owner failed to provide a vessel with equipment required to safely draw the slack from the suspension cables.

To meet the burden of proof to establish breach of the turnover duty, Smith must show not just that the dock barge was turned over in an unsafe condition, he must show that "the hazard was such that an expert and experienced stevedore would not 'be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.' " *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1208 (9th Cir. 1989) (quoting *Scindia*, 451 U.S. at 167, 101 S. Ct. at 1622). The evidence, viewed in the light most favorable to the plaintiff, indicates that no equipment was provided on the dock barge for safely drawing the slack out of the suspension cables that connected the river barges to the dock barge's winch system. It is reasonable to infer that Marine Terminals as vessel owner knew or should have known that the river barges would have to be connected to the dock barge's winch system for the unloading to occur. Evidence indicates that the use of the crane for the procedure was not reasonably safe but rather very dangerous, even for experienced stevedores. *See*, *e.g.*, *Gravatt*, 226 F.3d at 129 (noting a prior case where "negligence was found to be in the vessel capacity because it consisted of the failure to equip the tug properly for emergencies.").

Smith also claims that Marine Terminals as vessel owner violated its active control duty because the activity of drawing the slack out of the suspension cables was a vessel operation. Smith rests this claim on the premise that the crane operator acted negligently and in his capacity as an agent of Marine Terminals as vessel owner when he closed the crane on Smith's hand. Marine Terminals contends that the crane operator and Smith were acting as employees of Marine Terminals as employer rather than as vessel owner.

The difficulty, as mentioned above, is that in this case vessel operations and stevedore operations were one and the same because the vessel, *i.e.*, the dock barge, was used exclusively for stevedoring operations. Drawing the slack from the cable was simultaneously a vessel operation and a stevedoring operation because the only use of the vessel was stevedoring and all of the stevedoring occurred on the vessel. To grant summary judgment in favor of Marine Terminals on Smith's section 905(b) claim, the Court would have to say, as a matter of law, that Smith's injuries were caused by Marine Terminals only in its capacity as the employer and not in its capacity as vessel owner. The Court cannot to do that due to the unusual facts presented here, where the stevedore-employer performed its stevedore operations on a vessel so that vessel operations and stevedore operations were one and the same. Marine Terminals' motion for summary judgment on Smith's section 905(b) claim is denied.

## CONCLUSION

For the foregoing reasons, Marine Terminals' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Document #13. Marine Terminals' motion for summary judgment is granted on Smith's Jones Act claim, unseaworthiness claim, and maintenance and cure claim, but denied on Smith's section 905(b) claim. Smith's motion for leave to file a supplemental response is moot. Document #38.

IT IS SO ORDERED this 17th day of November, 2010.

_J. Leon Holmes_
J. LEON HOLMES
UNITED STATES DISTRICT COURT